

**FILED**

JAN - 3 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

|  |  |
|---|---|
| In re | Case No. 09-33388-A-7 |
| JOHN V. NORDLUND and JUDITH A. NORDLUND, | Docket Control No. JSO-2 |
| Debtors. | |

**MEMORANDUM**

Debtors John and Judith Norlund maintain that Bank of America (BofA) has repeatedly violated their bankruptcy discharge.  As a result, they ask the court to conclude that BofA has acted in contempt of court, and to compensate them for the damages BofA's contumacious conduct has caused them.

BofA holds the first, second, and third deeds on the debtors' former home in Hayfork, California.  <u>See</u> Docket No. 15 at 4.  While the debtors continue to own that residence, they stated their intention to surrender the property to BofA in their bankruptcy case.  Despite voluntarily leaving their home and offering it to BofA, BofA has not foreclosed and instead has chosen to send the debtors a barrage of letters asking, even demanding, that they continue to honor their contractual commitments to BofA despite the debtors' discharge and despite

their repeated requests that BofA leave them alone.  BofA's
hounding of the debtors even has continued during the pendency of
this motion.

I

A bankruptcy discharge "operates as an injunction against
the commencement or continuation of an action, the employment of
process, or an act, to collect, recover or offset any . . . debt
[subject to such discharge] as a personal liability of the
debtor, whether or not discharge of such debt is waived."  11
U.S.C. § 524(a)(2).  By its terms, this statute prohibits
affirmative action by a creditor to collect a discharged debt
from a debtor.

However, the Bankruptcy Code provides no private right of
action to a debtor when a debtor violates the discharge
injunction.  See 11 U.S.C. § 524; Walls v. Wells Fargo Bank, 276
F.3d 502, 508-09 (9th Cir. 2002); Cady v. SR Fin. Services (In re
Cady), 385 B.R. 756, 757-58 (Bankr. S.D. Cal. 2008); Barrientos
v. Wells Fargo Bank, 2009 WL 1438152 *4, 5 (S.D. Cal. Dec. 07,
2009).

Therefore, a debtor may seek damages for violation of the
injunction only by invoking the court's power under 11 U.S.C. §
105(a) to redress contempt.  A party who knowingly violates the
discharge injunction can be held in civil contempt of court.  See
Espinosa v. United Student Aid Funds, Inc., 553 F.3d 1193, 1205
n.7 (9th Cir. 2008) (citing Renwick v. Bennett (In re Bennett),
298 F.3d 1059, 1069 (9th Cir. 2002)).

///

-2-

Section 105(a) provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

The party seeking sanctions for contempt has the burden of proving, by clear and convincing evidence, that the sanctions are justified. Namely, the debtors must prove that the creditor (1) knew the discharge injunction was applicable, and (2) intended the actions which violated the injunction. See <u>Zilog, Inc. v. Corning (In re Zilog, Inc.)</u>, 450 F.3d 996, 1007 (9th Cir. 2006)(quoting <u>Bennett</u> at 1069).

II

At the end of 2007 Mr. Nordlund retired from his practice as a labor lawyer because he had begun experiencing physical and psychological problems. The latter included difficulties in maintaining attention, memory lapses, and depression. Soon after retiring, Mr. Nordlund's physical difficulties got much worse. He became bedridden. He was later diagnosed with polymyalgia rheumatica and depression. Treatment increased his mobility but he continued to experience pain and his mobility was restricted. Due to these problems, he applied for Social Security disability benefits. These benefits were granted in May 2009, retroactive to January 2009.

-3-

In May or June 2009, Mr. Nordlund began psychiatric treatment for depression.

Around the same time Mr. Nordlund was battling these physical and mental ailments, he and his wife experienced a significant financial setback.  He had saved approximately $800,000 in retirement accounts that permitted him to retire in 2007.  From August to October 2008, those accounts suffered significant market losses.  By the time a bankruptcy petition was filed, Mr. Nordlund had sustained an approximate $500,000 loss.

This financial setback meant that the debtors did not have sufficient monthly income from the retirement accounts and Mrs. Nordlund's employment as a nurse to pay their mortgage and other monthly obligations.

So, in late October 2008, the debtors approached their local banker at BofA and asked if it would be possible to restructure their home loans.  The banker referred the debtors to BofA's loss mitigation department.  The debtors contacted the department that day but got nowhere.  After being shuttled within BofA, they were referred to a nonprofit organization which might help them.  By the end of the day, the debtors concluded that they were unlikely to get anywhere restructuring their home loans so they started "reading up" on bankruptcy.  They stopped making their mortgage payments to BofA in December 2008.

In January 2009, the debtors looked for a local bankruptcy attorney and settled on Jeffrey S. Ogilvie.  Between January and June 2009, the debtors gathered their financial records and worked with Mr. Ogilvie and his staff.  They filed their chapter 7 petition on June 29, 2009.  They listed BofA as one of their

creditors.

BofA was apprised of the bankruptcy filing in due course.
It filed a request for special notice on July 31, 2009.  <u>See</u>
Docket No. 14.  The address referenced on the special notice
request is Katherine L. Johnson of PITE DUNCAN, LLP, 4375 Jutland
Drive, Suite 200 P.O. Box 17933 San Diego, CA 92177-0933.

The debtors' petition was accompanied by all schedules and
statements.  Schedule A listed their home in Hayfork as having a
value of $525,000 and Schedule D listed all three of BofA's deeds
of trust encumbering that property.  The debtors also stated
their intention to surrender their home to BofA instead of
reaffirming and paying the three deeds of trust.

Immediately following the meeting of creditors, the
bankruptcy trustee filed a "no-asset" report indicating that
there were no assets that could be liquidated for the benefit of
unsecured creditors.  <u>See</u> Docket No. 12.

On July 31, 2009, BofA filed a motion for relief from stay
with respect to the debtors' residence.  <u>See</u> Docket No. 15.  The
motion makes reference to the fact that the debtors wished to
surrender their home to BofA.  <u>See</u> Docket Nos. 17 & 19.  Without
objection, the court granted the motion at a hearing on September
29, 2009.  The court's order was entered on the docket on October
16, 2009.  <u>See</u> Docket Nos. 29 & 33.

The debtors received their discharge on October 7, 2009.
<u>See</u> Docket No. 30.  On October 9, 2009, a copy of the debtors'
discharge was mailed to BofA's counsel, Katherine L. Johnson, as
well as to BofA's loss mitigation department and its Greensboro,
North Carolina office.  <u>See</u> Docket No. 32 at 3.

On October 20, 2009, the debtors vacated their home in anticipation of BofA's foreclosure.

The bankruptcy case was closed on October 30, 2009. <u>See</u> Docket No. 35.

Even though the debtors had voluntarily vacated their home and had stated their intention to surrender it to BofA, even though the bankruptcy trustee had indicated he would not administer the home, or any other assets, for the benefit of unsecured creditors, and even though BofA, aware of these facts, had sought and obtained relief from the automatic stay in order to foreclose, BofA did not foreclose on the property. Instead, BofA chose to bombard the debtors with 24 written communications from October 21, 2009 through August 30, 2010, seemingly designed to harangue and coerce them into paying BofA rather than walking away from their home.

This prompted the debtors to reopen their case in order to compel BofA to take their home and leave them alone. <u>See</u> Docket No. 39.


                                    A

What follows is a summary of the 24 written communications sent by BofA to the debtors:

(1) On October 21, 2009, Bank of America sent the debtors a letter, informing them that the servicing of their loan will be transferred to BAC Home Loans Servicing LP as of November 16, 2009. The letter also tells the debtors that they will have a new loan account number. <u>See</u> Plaintiffs' Exhibit 1 Submitted at September 21, 2010 Evidentiary Hearing.

(2) On November 6, 2009, Bank of America sent the debtors a letter, telling them that while they may have recently received a bankruptcy discharge and are no longer personally liable to BofA on their account, BofA wishes to help the debtors with retaining ownership of the property or disposing of the property by a sale or a deed in lieu of foreclosure.  The letter says that BofA "will continue all collection and and [sic] foreclosure activity until a workout plan has been completed."  See Plaintiffs' Exhibit 2 Submitted at September 21, 2010 Evidentiary Hearing.

(3) On or about November 12, 2009, BAC sent the debtors and filed with the bankruptcy court a Notice of Change in Servicing, informing them that the servicing for BofA's loan secured by the first deed of trust was now with BAC Home Loans Servicing, a subsidiary of BofA.  See Exhibit E to BofA's Request for Judicial Notice; see also Docket No. 37.[1]

(4) On November 15, 2009, BAC sent the debtors a Debt Validation Notice, advising the debtors that the total outstanding balance on their loan was $454,538.33 and that they had 30 days to dispute the validity of the debt.  See Exhibit F to BofA's Request for Judicial Notice.

(5) On November 19, 2009, BofA sent the debtors a short year escrow account disclosure statement, itemizing the debtors' escrow account activity from March 2009 through November 2009. See Exhibit G to BofA's Request for Judicial Notice; see also Opposition at 7.

---

[1] For purposes of this ruling, the court treats BofA and BAC as one and the same party.  The distinction between BofA and BAC is immaterial to the resolution of this matter.

(6) - (10) Starting with a statement dated November 27, 2009, BAC sent the debtors five monthly statements.  The statements tell the debtors that their debt was discharged "in a bankruptcy case" and that they "have no personal obligation to repay it."  The statements contain outstanding payment amounts, payment due dates, payment instructions, and include a payment coupon.  The statements also inform the debtors that a late charge will be assessed against their loan if the next scheduled payment is not received within 15 days of the respective monthly payment due date.  The dates of the statements are November 27, 2009, December 24, 2009, January 26, 2010, February 25, 2010, and March 30, 2010.  See Exhibit H to BofA's Request for Judicial Notice.

(11) Sometime in February 2010, and not on or about January 15, 2010 as alleged by BofA, BofA sent the debtors a statement telling them that the balance on their home equity maximizer loan is $0.00 and that the minimum payment due was $0.00.  See Exhibit I to BofA's Request for Judicial Notice; see also Opposition at 7.

(12) On February 18, 2010, BofA sent the debtors a letter providing them with information about a loan modification.  See Exhibit A to Motion, Docket No. 48.

(13) On February 24, 2010, BAC sent the debtors a letter providing them with information about loan modification.  See Exhibit A to Motion, Docket No. 48.

(14) On March 3, 2010, BAC sent the debtors a letter asking them whether the property was vacant.  See Exhibit A to Motion, Docket No. 48.

-8-

(15) On April 26, 2010, BAC sent the debtors a letter, informing them that BAC is interested in speaking with them about their loan, to consider the following options: loan modification, repayment arrangements, deed-in-lieu, short sale/payoff, and full reinstatement.  The letter urges the debtors to call BAC.  The letter states that BAC is sending the letter to the debtors because "[m]any . . . customers are finding it difficult to make their monthly mortgage payments."  See Exhibit M to Debtors' Exhibits to Reply, Filed June 14, 2010, Docket No. 58.

(16) On or about April 29, 2010, BAC sent the debtors a statement informing them that their "loan is past due for multiple payments" and advising them "that any payments that are due . . . must be remitted immediately."  The statement directs the debtors to pay $3,540.19 by May 1, 2010.  See Exhibit A to Motion.[2]

(17) On May 9, 2010, BAC sent the debtors a letter informing them that their homeowner's insurance policy has expired and that they should forward or instruct their insurance agent to forward the insurance bill to BAC.  In the alternative, the letter states that BAC would have to purchase insurance for the property and that the cost for it would have to be paid from "[the debtors'] escrow/impound account."  "If [the debtors] do not have an escrow/impound account, one may be established."  See Exhibit A to Motion, Docket No. 48.

---

[2] BofA has not included this statement as part of its exhibits, despite describing it in its opposition.  See Opposition at 8.  The court also notes that Exhibits K and L, while mentioned in the opposition, are not attached to any of BofA's papers.

-9-

(18) On May 23, 2010, BAC sent the debtors a letter, asking them for proof of the insurance on the property.  The letter also says that BAC "may have to purchase [insurance] coverage for [the debtors]," at a cost of $3,381, covering the period from April 13, 2010 to April 13, 2011.  The letter informs the debtors that, in the event BAC purchases coverage, the cost of the coverage will be charged against the debtors' escrow/impound account, which in turn will trigger an adjustment to the debtors' monthly payments to BAC.  See Exhibit M to Debtors' Exhibits to Reply, Filed June 14, 2010, Docket No. 58.

(19) On May 28, 2010, BAC sent the debtors a statement informing them that their "loan is past due for multiple payments" and advising them "that any payments that are due . . . must be remitted immediately."  The statement directs the debtors to pay $3,540.19 by June 1, 2010.  See Exhibit M to Debtors' Exhibits to Reply, Filed June 14, 2010, Docket No. 58.

(20) On June 4, 2010, BAC sent the debtors a letter asking them whether the property is vacant.  If vacant, the letter reminds the debtors that they must have vacancy insurance coverage on the property.  The letter asks the debtors to provide BAC with proof of vacancy insurance coverage on the property.  Otherwise, the letter states, BAC may obtain vacancy coverage on behalf of the debtors, triggering an increase of the monthly payments to BAC.  See Exhibit M to Debtors' Exhibits to Reply, Filed June 14, 2010, Docket No. 58.

(21) On June 29, 2010, BAC sent the debtors a statement telling them that their debt may have been discharged in bankruptcy and that the statement "should not be construed as an

attempt to collect against you personally." The statement
contains principal balance as of June 29, 2010, an outstanding
monthly payment amount, a payment due date, payment instructions,
and includes a payment coupon. The statement also tells the
debtors that unless BAC receives $3,140.19 by July 16, 2010, the
debtors' loan with BAC will be assessed a late charge of $131.32.
See Exhibit P to Docket No. 67, July 27, 2010 Further Declaration
of John Nordlund, Docket No. 69.

(22) On July 1, 2010, BAC sent the debtors a letter telling
them that BAC purchased homeowner's insurance coverage on the
property at an annual cost of $3,381. The letter says that BAC
purchased the coverage because BAC did not receive insurance
information from the debtors, requested in prior correspondence
to them. The letter informs the debtors that if they do not have
an escrowed loan, BAC will adjust the debtors' monthly loan
payments so the debtors reimburse BAC for the cost of the
advanced insurance coverage. The letter states that advances by
BAC to pay insurance premiums are "[the debtors'] obligation."
The letter also offers the debtors to purchase earthquake
insurance coverage for the property, at their option. See
Exhibit P to Docket No. 67, July 27, 2010 Further Declaration of
John Nordlund, Docket No. 69.

(23) On July 29, 2010, BAC sent the debtors a statement
telling them that their debt "may" have been discharged in
bankruptcy and that the statement "should not be construed as an
attempt to collect against you personally." The statement
contains principal balance as of July 29, 2010, an outstanding
monthly payment amount, a payment due date, payment instructions,

and includes a payment coupon. The statement also tells the
debtors that unless BAC receives $3,140.19 by August 16, 2010,
the debtors' loan with BAC will be assessed a late charge of
$131.32. See Plaintiffs' Exhibit 5, introduced at September 21,
2010 Evidentiary Hearing.

(24) On August 30, 2010, BAC sent the debtors a statement
telling them that their debt may have been discharged in
bankruptcy and that the statement "should not be construed as an
attempt to collect against you personally." The statement
contains principal balance as of August 30, 2010, an outstanding
monthly payment amount, a payment due date, payment instructions,
and includes a payment coupon. The statement also tells the
debtors that unless BAC receives $3,140.19 by September 16, 2010,
the debtors' loan with BAC will be assessed a late charge of
$131.32. See Plaintiffs' Exhibit 6, introduced at September 21,
2010 Evidentiary Hearing.


B

Turning to the motion, the debtors have satisfied the first
requirement for sanctions against BofA for its violation of their
bankruptcy discharge. That is, there was a discharge and BofA
knew of it.

On October 9, 2009, BofA was served with the notice of the
debtors' discharge. The notice was served on BofA's counsel,
Katherine L. Johnson, BofA's loss mitigation department, and
BofA's Greensboro, North Carolina office. See Docket No. 32 at
3. And, BofA has not disputed receiving the notice of

discharge.[3]

C

Before reaching the principal issue, whether BofA intended its actions that violated the debtors' discharge injunction, the court must address the threshold issue of whether the communications violated the discharge injunction.

1

If considered individually, some of the communications did not violate the injunction.

The October 21, 2009 letter informing the debtors of the change in their loan servicer is not related to the collection of a debt. The letter makes no mention of loan payments, failure to make payments, or collection of payments.

The debtors do not complain about the November 12, 2009 Notice of Change in Servicing sent by BAC.

The November 19, 2009 short year escrow account disclosure statement is not related to the collection of a debt. The statement demands no payments and merely summarizes the activity

_____

[3] The debtors have satisfied the first requirement for sanctions against BAC as well. The court infers from the following facts that BAC knew that the discharge injunction was applicable. The loan was transferred to BAC for servicing on or about November 10, 2009, after the debtors had already obtained their discharge. See Docket No. 37 at 2; see also Docket Nos. 30 & 35. BAC and not BofA filed the Notice of Change of Servicing into the debtors' chapter 7 bankruptcy case, through an agent named Larry Buckley from Dallas, Texas, meaning that BAC also was aware of the debtors' bankruptcy case. See Docket No. 37. And, all five statements sent to the debtors, beginning November 27, 2009, state that BAC's "records indicate that in the past you received a discharge of this debt in a bankruptcy case."

in the debtors' escrow account with BofA from March through
November 2009.

The home equity maximizer loan statement sent by BofA
sometime in February 2010 is not related to the collection of a
debt.  The statement indicates that the balance on the loan is
$0.00 and that no payment is due.

The February 18 and February 24, 2010 letters are not
related to the collection of a debt.  Those letters include only
information about options the debtors had as to loan
modification.

The April 26, 2010 letter informing the debtors that BAC is
interested in exploring alternatives to foreclosure is not
related to the collection of a debt.  The letter states that it
was sent with the purpose "to help [the debtors] avoid
foreclosure."

This letter is similar to the February 18 and February 24,
2010 letters.  The April 26 letter says nothing about the
collection of payments.  It merely invites the debtors to
consider alternatives to foreclosure.  The information
communicated in these three letters likely had to be communicated
to the debtors pursuant to Cal. Civil Code § 2923.5 and Cal.
Civil Code § 2923.52 et seq., the California Foreclosure
Prevention Act.

The five statements dated November 27, December 24, January
26, February 25, and March 30 are also not related to the
collection of debts.  Each of the statements clearly states at
the top half of the first page that "[o]ur records indicate that
in the past you received a discharge of this debt in bankruptcy

-14-

in a bankruptcy case . . . [y]ou cannot be pressured to repay
this debt . . . we are providing detailed loan information as a
courtesy for you.  This is not an attempt to collect a debt that
has been discharged.  This is not a demand for payment.  The
coupon below and the envelope are provided as courtesy to you."
Thus, even though the statements contain outstanding payment
amounts, payment due dates, payment instructions, and include a
payment coupon, the language in each statement indicates that
they are not an attempt to collect a discharged debt.

The three statements dated June 29, July 29, and August 30,
2010 are also unrelated to the collection of debts.  Each of the
statements clearly states at the top half of the first page that
"[t]his statement is being furnished for informational purposes
only and should not be construed as an attempt to collect against
you personally.  While your obligation to BAC . . . may be
discharged by operation of law, BAC . . . has retained the
ability to enforce its rights against the property securing this
loan should there be a default."  Even though the statements
contain outstanding payment amounts, payment due dates, payment
instructions, and include a payment coupon, the language in each
statement indicates that they are not an attempt to collect a
discharged debt from the debtors personally.

2

On the other hand, the November 6, 2009 letter telling the
debtors that BofA wishes to help them retain the property or
dispose of it other than in a foreclosure, expressly states that
BofA intends to "continue all collection and and [sic]

-15-

foreclosure activity until a workout plan has been completed."
This is despite the letter's acknowledgment that the debtors "may
have recently received a discharge in a chapter 7 case and are no
longer personally obligated to [BofA] on [their] account."

In other words, while BofA acknowledges that the debtors may
not be liable due to a bankruptcy discharge, BofA states that it
intends to continue with "*all* collection."  And, the collection
intended by BofA is not qualified by the debtors' discharge.  It
is qualified only by the completion of "a workout plan," implying
that BofA is ignoring the debtors' bankruptcy discharge in its
collection efforts.

The court concludes that this letter violated the discharge
injunction.

The November 15, 2009 Debt Validation Notice gives the
debtors 30 days to dispute the validity of the debt referenced in
the notice.  The notice advises the debtors that the total
outstanding balance on their loan is $454,538.33.  Unless the
debtors dispute the validity of the debt, "BAC Home Loans will
assume the amount to be valid."

In other words, more than one month after the debtors
obtained their bankruptcy discharge, BAC is telling them that
they owe $454,538.33 to BAC.  See 11 U.S.C. § 524(a)(2).  The
notice sets in motion a preliminary procedure necessary for BAC
to collect the debt.  By referring to the debt and the fixing of
the amount of the debt, BAC's intention to collect the debt is
clear.  The notice even states that "this communication is from a
debt collector attempting to collect a debt, and any information
obtained will be used for that purpose."  The notice also makes

no mention of the debtors' bankruptcy case or discharge, even though BAC filed a Change in Servicing in the bankruptcy case only three days prior to sending the notice. See Docket No. 37.

In sending the notice, BAC intended to collect a discharged debt from the debtors. The court concludes that BAC willfully violated the discharge injunction by sending the notice.

BofA's argument that the notice was sent to the debtors in an attempt to comply with section 809 of the FDCPA only bolsters the court's conclusion. The purposes of the FDCPA are to eliminate abusive practices in the collection of consumer debts, to promote fair debt collection, and to provide consumers with an avenue for disputing and obtaining validation of debt information. By invoking the FDCPA, then, BofA acknowledges that the sending of the notice was an attempt to collect a debt, a discharged debt.

The March 3, 2010 letter asking the debtors whether the property was vacant is an attempt to collect a discharged debt. The letter asks the debtors to contact BAC if the property is vacant. The letter makes no reference to the debtors' bankruptcy discharge and it reminds the debtors that, if the subject property is vacant, "vacancy insurance coverage is a requirement of [their] loan." In fact, all of the debtors' obligations under their contract with BAC and BofA had been discharged.

The May 9, 2010 letter asking the debtors to instruct their insurance agent to forward the homeowner's insurance bill to BAC also is an attempt to collect a discharged debt. The letter does not stop by asking for the insurance bill to be forwarded to BAC. The letter goes on to state that BAC may have to purchase

-17-

replacement insurance itself, that the estimate for such
insurance cost would be $3,381, and that the insurance cost would
be charged to the debtors' escrow/impound account.  If the
debtors do not have an escrow/impound account, the letter states
that such an account may be established.

In other words, BAC is telling the debtors that it would
collect the cost of replacement homeowner's insurance coverage
from them, although such debts were discharged in their
bankruptcy case.  Even though the letter does not ask for payment
immediately, just as in the case of the debt validation notice,
the letter commences an action and/or employs a process for the
collection of the debt.  The letter sets in motion a process for
the establishment and fixing of the debt owed to BAC, absent
which BAC cannot collect the debt.  By referring to the debt and
estimating the amount of the debt, BAC's intention to collect the
debt is clear.

Moreover, the letter refers to the expiration of the
debtors' (i.e., "your policy") homeowner's insurance policy and
BAC's payment of "[the debtors'] [insurance] premium" "[u]pon
receipt of the bill."  Therefore, whether or not BAC receives the
bill from the debtors' insurance agent, BAC will pay the
insurance premium and then charge the debtors for this advance.
The letter assumes that the debtors' loan with BAC is still in
force and that their insurance obligations under the loan are
still in effect.  Nonetheless, the letter makes no mention of the
debtors' bankruptcy case or discharge, even though the letter was
sent after the instant motion had been already filed.

The court concludes that BAC willfully violated the

-18-

discharge injunction by sending the letter.  The court concludes
the same with respect to the May 23, 2010 letter as that letter
is very similar to the May 9 letter.

The July 1, 2010 letter violated the discharge injunction
because it is a follow-up letter to the May 9 and May 23 letters.
The July 1 letter informs the debtors that BAC has obtained
replacement homeowner's insurance coverage on the property and
that the debtors are responsible for paying the cost of the
coverage, even though they obtained a bankruptcy discharge of all
their debt arising from the loan with BAC, nearly 10 months
earlier.

The June 4, 2010 letter asking the debtors whether the
property is vacant violated the discharge injunction because,
unlike the March 3 letter asking the debtors for the same
information, the June 4 letter tells the debtors that BAC may
obtain vacancy insurance coverage and then charge the debtors for
the cost of the coverage.  The June 4 letter is similar to the
other insurance coverage letters, dated May 9 and May 23.  The
June 4 letter is telling the debtors that BAC would collect the
cost of replacement vacancy insurance coverage from them,
although such debts were discharged in bankruptcy.  Even though
the letter does not ask for payment immediately, the letter
commences an action and/or employs a process for the collection
of the debt.

The April 29, 2010 statement also violated the discharge
injunction.  This statement is the most serious of the violations
as it tells the debtors that their "loan is past due for multiple
payments," advises them "that any payments that are due . . .

-19-

must be remitted immediately," directs the debtors to pay
$3,540.19 by May 1, 2010, and BAC sent the statement to the
debtors after the instant motion was filed.  The statement does
not have any of the language found in the five statements
discussed above, referencing the debtors' bankruptcy case and
discharge, and telling them that they do not have to pay the
debt.  The statement makes no reference to the debtors'
bankruptcy case or discharge.  The court reaches the same
conclusion with respect to the May 28, 2010 statement, as it is
nearly identical to the April 29 statement.

3

Even though some of BofA's written communications to the
debtors seem innocuous, when BofA's 24 written communications
over a 10-month period are considered in context and as a whole,
a more disturbing picture is painted.  Even if each letter from
BofA had acknowledged the debtors' discharge and stated that BofA
would take no action against the debtors personally to collect
its three home loans, the sheer volume and repetitiveness of
BofA's letters communicated just the opposite.

It must be kept in mind that the 24 letters were sent even
though BofA knew that the debtors had previously requested a loan
modification that BofA had not granted, that they had filed
bankruptcy, that their discharge had been granted, that the
debtors wished to surrender their home to BofA, and that the
debtors had moved out of their home.  It was obvious that the
debtors had no interest in, or reason to, pay BofA, insure their
former home, or discuss alternatives to foreclosure.

Yet, BofA did not foreclose on its collateral and chose instead to correspond with the debtors for more than 10 months, from October 2009 through August 2010.  Its correspondence wavered between offering assistance and information to the debtors even though they did not want it, and making financial demands on the debtors that ignored their bankruptcy discharge.

Taken together, and in context, the court construes the 24 letters as a deliberate attempt by BofA to sow confusion and doubt as to whether it would recognize the debtors' discharge. Its goal seems to have been to convince the debtors to pay the bank despite their discharge.

The evidence leaves no doubt about BofA's purpose.

First, the bank has not explained its puzzling failure to foreclose on the Hayfork residence.  Approximately one year ago, it obtained leave from this court to foreclose on it then failed to do so.  In fact, despite knowing that the debtors had vacated the property in anticipation of a foreclosure and had ceased maintaining the property, BofA allowed the property to sit idle, be vandalized, and become weed choked.  Apparently, BofA is uninterested in its collateral and more interested in focusing its attention on the debtors.

Second, BofA's representative at the evidentiary hearing, Joe Peloso, testified that he began investigating the debtors' loan file for the bank on April 7, 2010.  He testified that the debtors' loans were properly coded to indicate they had filed bankruptcy and had received a discharge.  He testified that this coding should have resulted in no correspondence being sent to the debtors.

-21-

Yet, correspondence was being sent to the debtors and it continued to be sent to the debtors after Mr. Peloso began working on the file. He could not explain why this was so. He could find no computer or other error that accounted for the 24 letters sent to the debtors.

Because the bank is unable to point to any error, the court concludes the correspondence was not sent to the debtors in error. BofA sent the letters even though it knew the debtors had received a bankruptcy discharge. It did so in an effort to get the debtors to keep their home and pay the bank despite their bankruptcy discharge.

Third, and most disturbing, the correspondence continued even after the debtors filed their contempt motion. Their motion was filed and served by mail on March 18, 2010. After that date, 10 additional communications were sent to the debtors.

Further, on May 17, 2010, the debtors' counsel gave a copy of a letter from Mr. Nordlund's psychiatrist to the bank's attorneys. That letter confirmed that Mr. Nordlund was being treated for anxiety and depression. It also stated that Mr. Nordlund "has been receiving letters from lenders that are causing [a] worsening of his symptoms and causing more anxiety." Even this did not stop the letters from BofA. It sent 7 more letters to the debtors after May 17, 2010.

Finally, BofA continued to send correspondence to the debtors despite nine separate requests that it stop making any demands on the debtors.

Despite being told to cease and desist, and despite being advised of the harm being caused, the bank persisted in making

-22-

financial demands on the debtors.   While BofA denies this

interpretation of its actions, it has not come forward with any

other plausible explanation.   Many of its written communications

to the debtors, when viewed in insolation, seem benign.   But, in

the context described above, the cumulative message conveyed by

the bank's correspondence was clear: pay.

D

Even though BofA, at times, gave lip service to the debtors'

earlier discharge, by sending 24 written communications to the

debtors, it was communicating a none too subtle demand that the

debtors pay it, discharge or no.   The court concludes that BofA

willfully violated the discharge injunction.   That is, BofA knew

the debtors had received a discharge but nevertheless sent the

debtors a string of letters, the cumulative purpose and effect of

which, was to get the debtors to pay BofA despite that discharge.

BofA has acted in contempt of this court.

E

The court rejects BofA's argument that its written

communications with the debtors did not violate the discharge

injunction because they were made pursuant to 11 U.S.C. § 524(j).

This section provides that:

> "Subsection (a) (2) does not operate as an injunction
> against an act by a creditor that is the holder of a
> secured claim, if —
>> (1) such creditor retains a security interest in
>> real property that is the principal residence of
>> the debtor;
>> (2) such act is in the ordinary course of business

> between the creditor and the debtor; and
> (3) such act is limited to seeking or obtaining
> periodic payments associated with a valid security
> interest in lieu of pursuit of in rem relief to
> enforce the lien."

Section 524(j) does not apply here because the property was not the debtors' principal residence when BAC sent the notice, the letter, and the statements.  The debtors had vacated the property on October 20, 2009, nearly one month prior to the November 15, 2009 debt validation notice.  See John Nordlund Decl. at 4.

In reaching its conclusion, the court has considered also that BofA was well-aware of the debtors' intention to surrender the property to it.  On the information sheet of BofA's motion for relief from stay, filed on July 31, 2009, BofA noted that "[p]ursuant to debtors' statement of intent, the debtors intend to surrender the property."  See Docket No. 19.  And, BofA was aware that the debtors had vacated the property in late October 2009 because BofA had been sending its representatives to inspect the property every month.  See Judith Nordlund Decl. at 2; see also John Nordlund Decl. at 4.


                                III

This leaves the question of a remedy.

When a party acts in contempt of court by violating a debtor's discharge, the bankruptcy court may award the debtor "compensatory damages, attorneys fees, and [coerce] the offending creditor's compliance with the discharge injunction."  See Walls v. Wells Fargo Bank, 276 F.3d 502, 507 (9th Cir. 2002).  However, this court may not award "serious punitive penalties" for a

-24-

violation of the discharge injunction.  See In re Dyer, 322 F.3d
1178, 1193-94 (9th Cir. 2003).

A

Here, the court is particularly concerned, given BofA's
willingness to continue sending correspondence to the debtors,
even after the filing of the contempt motion, and given Mr.
Nordlund's serious medical condition, that the bank will continue
to make unlawful demands on the debtors.  Therefore, if a further
written communication is sent directly to the debtors, the court
will require BofA to pay $1,000 to the debtors.  For each
additional written communication sent to the debtors, BofA will
pay $500 more than paid for the prior communication sent to the
debtors.  See Dyer at 1192 (holding that "[c]ivil penalties
[under the court's contempt authority of section 105(a)] must
either be compensatory or designed to coerce compliance").

If BofA concludes that it is required by law or agreement to
give a notice or other written communication to the debtors, it
shall be given to their attorney.

B

Mrs. Nordlund testified that she missed 12 hours of work to
appear at the evidentiary hearing.  She receives $34 an hour in
her employment as a nurse.  The court will award her $408 for her
lost wages.

C

The court also will award the debtors their reasonable

-25-

attorneys' fees and costs associated with the prosecution of this motion.  In a separate written ruling appended to the minutes of the hearing conducted on November 29, 2010, the court determined that the debtors were entitled to recover $35,167.50 in attorney's fees and $2,095.68 in costs.

D

The debtors, particularly Mr. Nordlund, maintain that BofA's conduct inflicted on them serious emotional distress.  They demand $85,000 in compensation for "emotional distress, and other costs."  <u>See</u> Docket No. 56, June 14, 2010 Reply at 13.

BofA maintains that damages for emotional distress cannot be awarded for two reasons.

First, to award such damages would violate the Ninth Circuit's holding in <u>Walls v. Wells Fargo Bank</u>, 276 F.3d 502, 507 (9th Cir. 2002).  That is, because there is no private right action for a violation of the discharge injunction, the debtors can recover only the fees and costs associated with compelling the bank to obey the discharge injunction.  They cannot claim other damages.

Second, assuming such damages are recoverable, they cannot be recovered in this case because the bank's conduct was not such that it would inflict emotional distress on a reasonable person.

The court rejects both arguments.

1

Emotional distress damages do not violate <u>Walls</u> because such damages are compensatory in nature.  <u>Walls</u> permits parties to

-26-

recover compensatory damages for civil contempt.  <u>Walls</u> at 507
(providing that civil contempt is the normal remedy for violation
of the discharge injunction and that "compensatory civil contempt
allows an aggrieved debtor to obtain compensatory damages,
attorneys fees, and the offending creditor's compliance with the
discharge injunction").

    <u>Walls</u> did not limit compensatory damages to attorney's fees
and costs.  Such a limitation is inconsistent with <u>Dyer</u>'s
interpretation of compensatory damages that are compensable under
the court's civil contempt power.  <u>Dyer</u> at 1195.  Citing <u>Walls</u>,
the court in <u>Dyer</u> emphasized that "attorneys' fees are *an*
appropriate *component* of a civil contempt award."  <u>Id</u>. (emphasis
added).  In other words, besides attorney's fees and costs, there
are other components of compensatory damages that may be awarded
by the bankruptcy court pursuant to its authority to redress a
contempt of court.

    This court respectfully disagrees with <u>In re Urwin</u>, No. 07-
1104, 2010 WL 148645, at *8 (Bankr. D. Id. Jan. 14, 2010), where
the court disallowed emotional distress damages for violation of
the discharge injunction.

    <u>Urwin</u> held that section 105(a) authorizes only remedies
"'necessary' to enforce the bankruptcy code" and held that such
remedies do not include damages for "intangible kinds of harm"
because they are not necessary to the enforcement of section
524(a) and because they are inconsistent with the <u>Walls</u>' holding
that there is no private right of action for violations of the
discharge injunction.  <u>Urwin</u> at 8 (citing <u>Perry v. U.S. Bank
Nat'l Ass'n (In re Perry)</u>, 03.2 I.B.C.R. 128, 129-30 (Bankr. D.

Id. 2003)).

However, neither Dyer nor Walls limited the remedy available under section 105(a) to damages for tangible kinds of harm. The words tangible or intangible do not appear in either case. Rather, Dyer defined civil penalties under section 105(a) as any other civil contempt sanctions, namely, "sanctions associated with civil contempt-that is, compensatory damages, attorney fees, and the offending creditor's compliance-adequately meet [the] goal" of section 105(a), "rendering serious punitive sanctions unnecessary." Dyer at 1193; see also In re Feldmeier, 335 B.R. 807, 812 (Bankr. D. Ore. 2005) (quoting Dyer at 1193). Urwin and Perry cited Dyer at 1193 to support their conclusion that emotional distress damages are unavailable for violations of the discharge injunction. But, that portion of Dyer relates only to whether punitive contempt sanctions are available under section 105(a). Dyer at 1192.

Also, the bankruptcy courts in Urwin and Perry, in effect limited the debtor's remedy to a recovery of attorney's fees, costs, and incidental costs associated with prosecuting the motion to compel the creditor to obey the discharge injunction. The debtors in those cases recovered only their fees, costs, and reimbursement for their time away from work while prosecuting the motion. Any harm caused by the violation of the discharge injunction was not redressed. This court does not believe this is consistent with Walls and Dyer which direct the court to award compensatory damages.

For instance, if a creditor enforced a discharged unsecured claim by levying on a debtor's car, the court could award the

-28-

debtor damages for the loss of use of the car and compel the creditor to return the car.

Similarly, when a creditor threatening to collect a discharged debt causes emotional distress to a debtor, the court may compel the creditor to halt its offensive behavior and compensate the debtor for the emotional distress caused by the creditor.

The Bankruptcy Code limits chapter 7 discharges to individuals.  One of the benefits an individual receives from a discharge is peace of mind.  The individual need no longer be concerned that a discharged debt will be enforced against him or her.  When a creditor disregards the discharge and attempts to collect a debt, it is certainly within the realm of possibility that the debtor will be harmed emotionally.  When such occurs, the harm may be remedied.  Cf. Dawson at 1146; Feldmeier at 813.

2

The court rejects BofA's second argument as well.

"'[T]o be entitled to damages for emotional distress . . . an individual must (1) suffer significant harm, (2) clearly establish the significant harm, and (3) demonstrate a causal connection between the significant harm and the violation. . . . Fleeting or trivial anxiety or distress does not suffice to support an award; instead, an individual must suffer significant emotional harm.'"  In re Feldmeier, 335 B.R. 807, 814 (Bankr. D. Ore. 2005) (a case awarding emotional distress damages in the context of contempt action based on a violation of the discharge injunction; citing Dawson v. Washington Mutual Bank (In re

-29-

Dawson) 390 F.3d 1139, 1149 (9th Cir. 2004), a case interpreting former 11 U.S.C. § 362(h)).

Such harm may be established in several different ways, including corroborating medical evidence and testimony by non-experts, such as family members, friends, or coworkers, of "'manifestations of mental anguish . . . establish[ing] that significant emotional harm occurred.'"  In addition, in some cases, "'significant emotional distress may be readily apparent even without corroborative evidence,' such as when a creditor engages in egregious conduct '[o]r, even if the violation . . . was not egregious, the circumstances may make it obvious that a reasonable person would suffer significant emotional harm.'" Feldmeier at 814 (citing Dawson at 1149-50).

The "reasonable person" standard applied by Feldmeier and mentioned by Dawson is consistent with California law, where the standard is "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure."  See, e.g., Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009) (quoting Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 1004 (1993)).

However, when a defendant knows that the plaintiff has a "special" condition, this is considered when determining whether the defendant's conduct was extreme and outrageous.  See Bundren v. Superior Court, 145 Cal. App. 3d 784, 791 n.10 (1983) (citing comment f, illustration 12 of Torts Rest. 2d § 46).  "That the defendant knew the plaintiff had a special susceptibility to emotional distress is a factor which may be considered in determining whether the alleged conduct was outrageous." McMahon

1 | v. Craig, 176 Cal. App. 4th 1502, 1516 (2009) (quoting Cochran v.

2 | Cohran, 65 Cal. App. 4th 488, 495 (1998), citing Angie M. v.

3 | Superior Court, 37 Cal. App. 4th 1217, 1226 (1995)).

4 |     BofA argues that its 24 written communications to the

5 | debtors would not inflict significant emotional harm on a

6 | reasonable person.  The court disagrees.

7 |     As Mrs. Nordlund testified, when the debtors first began

8 | receiving the communications, she was not overly concerned.  But,

9 | as the communications continued despite nine separate requests

10 | that the bank stop corresponding with them, Mrs. Nordlund began

11 | to experience emotional distress.  They also asked Mr. Nordlund's

12 | psychiatrist to write a letter to BofA, asking it to stop sending

13 | them.  BofA nevertheless continued sending the communications.

14 |     Even after the debtors filed this motion, BofA continued

15 | sending the communications.  As noted earlier, BofA sent some 10

16 | communications after this motion was filed and served.  The last

17 | communication was sent on August 30, 2010.  BofA sent

18 | communications to the debtors for a 10-month period, virtually

19 | from the day they received their discharge and continuing during

20 | the period this motion was being litigated.

21 |     Based on the above, the court concludes that the 24

22 | communications, in the context and under the circumstances they

23 | were sent, as discussed earlier, even without corroborative

24 | evidence, were so egregious that a reasonable person would suffer

25 | significant emotional harm.  This is clear from their impact on

26 | Mrs. Nordlund who had no pre-existing condition making her

27 | usually sensitive to the bank's conduct.  Significant emotional

28 | distress is readily apparent from the context and circumstances

of the communications.   <u>See</u> <u>Dawson</u> at 1149-50.

At the hearing, BofA argued that Mrs. Nordlund suffered no more than a momentary upset that did not rise to the level of significant emotional distress.   While it is clear that Mrs. Nordlund was slower to react to the bank's misconduct and was not as affected by it as was her husband, the bank's persistence over a 10-month period and its profound impact on her husband's mental health, put a cumulative emotional strain on Mrs. Nordlund that eventually manifested itself physically and emotionally.

As to Mr. Nordlund, the court takes note of the fact that Mr. Nordlund's psychiatrist sent a letter to BofA asking it to halt its communication with him.   In spite of the letter informing BofA of Mr. Nordlund's condition and what the communications were doing to his mental health, BofA did not cease and desist.   And, it is clear from Mr. Nordlund's testimony and that of his mental health professional, Dr. Carlson, that the bank's behavior had a profoundly negative impact on his mental health.   The record, then, includes corroborative evidence of the significant emotional distress suffered by Mr. Nordlund.

The debtors have clearly established that they suffered significant emotional distress and they have established the causal connection between the significant emotional harm and the violation of the discharge injunction.

Accordingly, the court will award Mrs. Nordlund $5,000 and Mr. Nordlund $35,000 in emotional distress damages.

IV

The court does not want to leave the impression that home

lenders should not contact borrowers who have filed chapter 7
cases and received discharges in order to offer them loan
modifications.  On the contrary, it encourages such contacts and
they may be required by applicable nonbankruptcy law.  See Cal.
Civil Code § 2923.52 et seq.

In this case, however, BofA did much more than ask whether
the debtors wished to modify their home loan.  For 10 months, it
sent a constant stream of written communications to the debtors,
asking them to consider a loan modification, asking for insurance
policies, attaching payment coupons, demanding reimbursement for
insurance premiums, and inquiring as to whether the property was
vacant.  This steady drumbeat suggested that the bank did not
want to foreclose (even though the debtors wanted the bank to
foreclose) and instead was interested only in getting the debtors
to pay the bank.  This conduct continued despite the debtors'
repeated demands that it stop.  It continued even after the bank
was advised that it was having a profound negative effect on Mr.
Nordlund's mental health.  It continued after the contempt motion
was filed.  And, it continued while the court was considering the
contempt motion.

In its defense, BofA did not suggest that some bureaucratic
or computer error had occurred that resulted in some or all of
the 24 written communications being sent to the debtors.  Its
evidence indicated that the debtors' file correctly noted the
debtors' bankruptcy and discharge.  Hence, the bank's course of
conduct must have been intended and it was with the full
knowledge that the debtors had received a bankruptcy discharge.

For the foregoing reasons, the motion will be granted in part.  A separate order will be entered.

Dated: 3 Jan 2011

By the Court

_____
Michael S. McManus, Judge
United States Bankruptcy Court

# CERTIFICATE OF MAILING

I, Susan C. Cox, in the performance of my duties as a judicial assistant to the Honorable Michael S. McManus, mailed by ordinary mail to each of the parties named below a true copy of the attached document.

Michael DeArton
Jeffrey Ogilvie
1330 West St
Redding, CA 96001

John Acierno
Katherine Johnson
4375 Jutland Dr #200
PO Box 17933
San Diego, CA 92177-0933

Dated: January 3, 2011

_Susan C. Cox_
Susan C. Cox
Judicial Assistant to Judge McManus